USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    3/30/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
CARMEN NIEVES,                                                     :
                                                                               :
                              Plaintiff,                                 :            **OPINION &**
                                                                               :            **ORDER**
-v-                                                                           :            20-CV-4179 (JLC)
                                                                               :
ACTING COMMISSIONER OF SOCIAL                       :
SECURITY, [1]                                                       :
                                                                               :
                              Defendant.                              :
                                                                               :
-----------------------------------------------------------------------X
**JAMES L. COTT, United States Magistrate Judge.**

        Plaintiff Carmen Nieves seeks judicial review of a final determination made

by defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security

Administration, denying her applications for disability insurance benefits and

supplemental security income under the Social Security Act.  The parties have

cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  For the reasons set forth below, Nieves' motion is granted,

the Commissioner's cross-motion is denied, and the case is remanded for further

proceedings.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security
Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the
Acting Commissioner is substituted for the Commissioner as the defendant in this
action.

# I. BACKGROUND

## A. Procedural History

Nieves filed an application for Disability Insurance Benefits ("DIB") on October 22, 2012 and an application for Supplemental Security Income ("SSI") on December 3, 2012, alleging a disability onset date of March 5, 2011. Administrative Record ("AR"), Dkt. No. 12, at 543–55.[2] The Social Security Administration ("SSA") denied Nieves' claims on February 14, 2013. *Id*. at 388–95. Nieves requested a hearing before an Administrative Law Judge ("ALJ") on March 6, 2013. *Id*. at 396–412. On March 14, 2014, Nieves appeared before ALJ Sean P. Walsh, represented by counsel. *Id*. at 205–18. ALJ Walsh denied Nieves' applications on May 30, 2014 and the Appeals Council remanded her case on September 22, 2015. *Id*. 351–77. On remand, ALJ Seth I. Grossman held a hearing on February 12, 2016 and a supplemental hearing on March 10, 2017. *Id*. 241–324. At both hearings, Nieves was represented by counsel. *Id*. ALJ Grossman denied Nieves' applications on May 9, 2017, and the Appeals Council subsequently denied her request for review on January 25, 2018. *Id*. at 1–21. Nieves appealed to the District Court, and the Honorable Ona Wang remanded the case on July 16, 2019 following oral argument

---

[2] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.

five days earlier.  *Id.* at 1536–98.[3]  The Appeals Council remanded the case to an ALJ on August 23, 2019.  *Id.* at 1599–1600.

On remand from the District Court, Nieves appeared at a December 12, 2019 hearing before ALJ John Carlton, represented by counsel.  *Id.* at 1455–1508.  A vocational expert also testified at this hearing.  *Id.*  In his decision dated February 3, 2020, ALJ Carlton concluded that Nieves became disabled on August 8, 2019 and continued to be disabled through the date of decision, but was not disabled prior to that date.  *Id.* at 1422–45.[4]  He denied Nieves' DIB application.  *Id.*  ALJ Carlton's decision is the final decision of the Commissioner.[5]

Nieves timely commenced this action on June 1, 2020, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Complaint ("Compl."), Dkt. No. 1.  The Commissioner answered Nieves' complaint by filing the administrative record on January 4, 2021.  Dkt. No. 12.  On May 4, 2021, Nieves moved for judgment on the pleadings and submitted a memorandum of law in support of her motion.  Notice of Motion, Dkt. No. 20; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No.

---

[3] Nieves' memorandum erroneously states that the remand order was dated August 20, 2019.  Pl. Mem. at 2.

[4] Nieves' memorandum erroneously states that ALJ Carlton's decision was dated January 29, 2020.  Pl. Mem. at 2.

[5] ALJ Carlton's decision was made following remand from the Appeals Council. While Nieves did not appeal ALJ Carlton's decision to the Appeals Council, she asserts that his decision is the final determination of the Commissioner, and the Commissioner does not object to this characterization.  *See* Pl. Mem. at 2; Def. Mem. at 18.

21.  The Commissioner cross-moved for judgment on the pleadings on August 5, 2021 and submitted a memorandum in support of her motion.  Notice of Cross-Motion, Dkt. No. 26; Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Response to Plaintiff's Motion ("Def. Mem."), Dkt. No. 27.  On August 26, 2021, Nieves submitted reply papers.  Reply Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Reply"), Dkt. No. 28.

### B. The Administrative Record

#### 1. Nieves' Background

Nieves was born on October 7, 1969.  AR at 92.  She was 40 years old on her alleged disability onset date, 41 years old when she filed her applications, and 50 years old on the date of the most recent ALJ decision.  *Id*. at 92, 1445.  At the time of the ALJ hearing in 2019, Nieves lived with her 17-year-old son.  *Id*. at 1497.  At the time of the most recent ALJ decision, Nieves lived in the Bronx.  *See, e.g., id*. at 1422.  Nieves received her GED and completed a year of community college education.  *Id*. at 208.  Nieves has prior work history as a security guard at a domestic violence shelter.  *Id*. at 1464.

In 2006, Nieves underwent gastric bypass surgery.  *Id*. at 1482.  Following the surgery, she developed anemia and depression, and had to leave her job in 2009.  *See, e.g., id*. at 1270, 1463–67, 1482–83.  Since then, she has suffered from physical and psychiatric impairments, including anemia, ulcers, chronic fatigue syndrome, neurologic disorders, digestive disorders, severe abdominal pain, hernia, major

4

depression, hallucinations, and bilateral neck and shoulder problems. *Id*. at 588, 1460, 1490.  In 2015, she was authorized by Fidelis Care New York to receive personal care services for housekeeping, shopping, meal preparation, and some or total assistance with personal hygiene, dressing, and feeding. *Id*. at 1280–81.  At the time of the 2019 hearing, Nieves utilized a home health attendant who completed her shopping, laundry, washing, cleaning, and cooking. *Id*. at 1494.

### 2. Medical Evidence

Nieves has provided a summary of the medical evidence contained in the administrative record. *See* Pl. Mem. at 2–24.  The Commissioner has adopted Nieves' recitation of the relevant facts and underlying proceedings. *See* Def. Mem. at 6.  She has also submitted additional or contrary facts in the briefing of this motion, to which Nieves does not object.  Having examined the record, the Court adopts the parties' summaries as accurate and complete for the purposes of the issues raised in this action.  The Court will discuss the medical evidence pertinent to the adjudication of this case in Section II(C) below. *See, e.g., Platt v. Comm'r*, No. 20-CV-8382 (GWG), 2022 WL 621974, at *2 (S.D.N.Y. Mar. 3, 2022) (adopting parties' summaries of medical evidence).

### 3. ALJ Hearing

On December 12, 2019, represented by counsel, Nieves appeared before the ALJ at a hearing.  AR at 1455–1508.  Her counsel argued that Nieves had both psychiatric and physical impairments, including major depressive disorder, bilateral neck and shoulder problems, and severe anemia that caused severe

fatigue, among other physical problems.  *Id.* at 1460.  He further noted that the level of support she received by having a home health attendant would demonstrate that she was sedentary and functions under the Paragraph C criteria; without such support she would "decompensate if she were in any kind of work-like setting." *Id.* at 1460–61.

At the time of the hearing, Nieves lived with one of her three sons, who was 17 years old.  *Id.* at 1497.  During the hearing, Nieves testified that she was not working, and had not worked since June 2009, when she left her job as a security guard in a domestic violence shelter because she was "falling asleep" frequently and could no longer complete the required tasks.  *Id.* at 1463–67, 1482–83.

The ALJ then asked Nieves about a series of ailments.  First, Nieves testified that her Primary Care Physician ("PCP") Michele Tyler gave her a cane to use for her vertigo about eight months prior to the hearing.  *Id.* at 1468.[6]  Nieves explained that she uses it "any time [she] leave[s] the house," but that she only leaves the house for medical appointments and "stuff like that."  *Id.* at 1469.  Next, Nieves testified about numbness and pain in her hands.  *Id.* at 1469–75.  Nieves described that due to her carpal tunnel, her hands would cramp, get numb, and "tingl[e]" in the morning and "throughout the day" if she held something.  *Id.* at 1469–70, 1472.  Because of this condition, a doctor gave her a brace to wear while sleeping at night, which Nieves testified had helped "[a] little bit."  *Id.* at 1470.  According to Nieves,

---

[6] The record indicates that Michele Tyler is a Family Nurse Practitioner ("FNP"). *Id.* at 1440, 2170.

using the cane was "painful" because she needed to use her hand to operate it. *Id.* at 1474. She indicated that the pain and numbness had been going on for roughly two years. *Id.* at 1474–75.

Next, Nieves testified about pain caused by a car accident in 2017 and subsequent shoulder surgery. *Id.* at 1476–78. Nieves' right shoulder had "ripped" and was "very painful" following the accident. *Id.* at 1478. When asked if the surgery helped, Nieves replied "[n]ot too much; it's better, but it's not perfect." *Id.* She mentioned that her range of motion and ability to move her shoulder was different after the surgery, but she still could not lift her arm above her head or put something up on a shelf. *Id.* at 1480.

The ALJ then asked Nieves about her anemia. *Id.* Nieves testified that its symptoms had not changed at all since 2011. *Id.* at 1480–81. She explained that the anemia caused her to feel "weak, dizzy, [and to have] no strength." *Id.* at 1481. Nieves stated that she felt that way "all the time;" "every day" since 2011 had been "more or less the same." *Id.* at 1481–82. She tried to work from 2006 to 2009 but the problems worsened during that time until finally she was unable to continue working and left her job in 2009. *Id.* at 1483. Nieves testified that due to drowsiness caused by her medications, she slept during the day "most of the time." *Id.* at 1494. She added that her doctors knew she was "sleeping most of the day." *Id.* at 1498.

Nieves further testified that in addition to the anemia, following her gastric bypass surgery in 2006, she suffered from gastritis and acid reflux, and often threw

up the food that she ate.  *Id.* at 1486.  Through the date of the hearing, she testified that she still experienced pain that felt like it was "killing [her]" and that could last for three hours at a time.  *Id.*  Her gall bladder was removed two years prior to the hearing, in 2017, which had resulted in the acid reflux worsening.  *Id.*  Nieves testified that her gastroenterology ("GI") doctor was Hilary Hertan.  *Id.* at 1487.[7] Nieves had last seen him approximately four months before the hearing, and prior to that in the previous year.  *Id.*  He had prescribed medications, but none "work[ed]."  *Id.* at 1487–88.  Nieves testified that she took "like six different things to stop the gas and the burning," which was "worse than anything in the world because the pain stops [her] from everything in the world."  *Id.* at 1488.

With respect to her mental impairments, the ALJ then acknowledged that Nieves had been "getting mental health treatment pretty much throughout this period of time [in question in the application] . . . fairly consistently."  *Id.* at 1485. Nieves testified that this was for depression, which she developed because she was no longer able to do "things" she used to do before her physical impairments.  *Id.* She explained that she could not concentrate, and experienced forgetfulness.  *Id.* at 1489.  She also described hallucinations in which she heard and saw things that were not there, such as a door knock, phone ring, someone calling her name, or something running across the bathroom.  *Id.* at 1490.  At the time of the hearing,

---

[7] The transcript spells the name of this doctor phonetically, as Hillary Hurton. Upon a review of the record, this appears to be Dr. Hilary Hertan, a gastroenterologist at Montefiore Medical Center in the Bronx, from whom Nieves had previously sought treatment as early as 2012.  *See id.* at 648–781.

Nieves had experienced hallucinations for upwards of seven to nine years.  *Id.*
Nieves testified that her medication helped her "feel better" because she was able to
fall asleep and had less anxiety than without taking them, but that they did not
"completely" help, as she still saw and heard things that were not there when she
was awake.  *Id.* at 1491–92.

Nieves testified that she was approved for a home health attendant, who was
a family member.  Before she had access to a paid attendant, other family members
helped her "cope."  *Id.* at 1494–95.  The home health attendant "[did] everything,"
including shopping, laundry, washing, cleaning, and cooking.  *Id.* at 1494.

The ALJ next questioned Vocational Expert ("VE") Dawn M. Blythe.  *Id.* at
1499–1506.  The VE explained that Nieves' past work experience would be classified
as a composite job of security monitor performed at a heavy level based on her
testimony, and commercial cleaner, which is a heavy-level position.  *Id.* at 1500–01.
The ALJ then described a hypothetical individual of Nieves' same age, education,
and work experience who is limited to sedentary work and would (1) not be able to
reach overhead with their dominant arm; (2) need to limit activities to no more than
frequent fingering/feeling/handling bilaterally; (3) not be able to work on ladders,
ropes, or scaffolds; (4) be limited to occasional use of ramps and stairs; (5)
occasionally balance stoop, crouch, crawl, and kneel; (6) not be able to work at
unprotected heights or around dangerous machinery; (7) be limited to
simple/routine work not done at a production rate pace; and (8) be able to interact
with and react appropriately with supervisors, co-workers, and the general public

9

on an occasional basis. *Id*. at 1501. The VE concluded that, based on these conditions, the hypothetical individual would not be able to perform Nieves' past work and that there would be no transferable skills given the restriction to simple and routine work. *Id*. at 1501–02.

The VE then testified that such an individual would be able to hold the positions of document preparer, addresser, and surveillance system monitor. *Id*. at 1502. She noted that no more than ten percent off-task time, and no more than one absence per month (which included days on which an individual needed to miss a substantial part of the day due to coming in late or leaving early), would be considered acceptable in full-time competitive employment. *Id*. at 1502–03. In response to a question from Nieves' attorney, the VE then clarified that for surveillance system monitor jobs, the off-task time considered acceptable would be no more than five percent. *Id*. at 1503. Finally, she concluded that a surveillance system monitor has to be able to exercise a certain amount of judgment. *Id*.

The ALJ then added one more restriction to the same hypothetical he had previously posed to the VE, for an individual limited to no more than occasional handling, fingering, and feeling bilaterally. *Id*. at 1506. The VE noted that the only job with those restrictions would be the surveillance system monitor, of which, the ALJ observed, there are not adequate numbers available. *Id*.

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v.*

*Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949

F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).

"[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable

factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting

*Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the

Commissioner's decision, "the reviewing court is required to examine the entire

record, including contradictory evidence and evidence from which conflicting

inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722

F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without

remanding . . . for a rehearing." 42 U.S.C. § 405(g).  However, "[w]hen there are

gaps in the administrative record or the ALJ has applied an improper legal

standard, [the court has], on numerous occasions, remanded to the [Commissioner]

for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir.

1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in

original).

### 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id*. (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4).  First, the Commissioner must establish whether the claimant is

presently employed. 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed,

the Commissioner goes to the second step and determines whether the claimant has

a "severe" impairment restricting his ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant has such an impairment, the Commissioner moves to the third step

and considers whether the medical severity of the impairment "meets or equals" a

listing in Appendix One of Subpart P of the regulations. 20 C.F.R. §

404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id.*; 20 C.F.R. §

404.1520(d).  If not, the Commissioner continues to the fourth step and determines

whether the claimant has the residual functional capacity ("RFC") to perform his

past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not

have the RFC to perform past relevant work, the Commissioner completes the fifth

step and ascertains whether the claimant possesses the ability to perform any other

work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537

F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the

Commissioner at the fifth and final step, where the Commissioner must establish

that the claimant has the ability to perform some work in the national economy.

*See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims*

*v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ,

unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record in light of the essentially non-adversarial nature of a benefits

proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation

marks omitted).  As part of this duty, the ALJ must "investigate the facts and

develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at

111.  Specifically, under the applicable regulations, the ALJ is required to develop a

claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§

404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a

claimant's medical records and reports but also the duty to question the claimant

adequately about any subjective complaints and the impact of the claimant's

impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-

11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold

question.  Before determining whether the Commissioner's final decision is

supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be

satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's

regulations' and also fully and completely developed the administrative record."

*Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y.

July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs*., 685 F.2d 751,

755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL

22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully

develop the record is a bedrock principle of Social Security law." (citing *Brown v.

Apfel*, 174 F.3d 59 (2d Cir. 1999)))).  The ALJ must develop the record even where

15

the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.

1996).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*,

569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported

by substantial evidence but because the ALJ should have developed a more

comprehensive record before making his decision.").

### c. Treating Physician Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in

determining whether a claimant is disabled under the [Social Security] Act." *Pena*

*ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y.

Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation

marks omitted).[8]  A treating physician's opinion is given controlling weight,

provided the opinion as to the nature and severity of an impairment "is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and

is not inconsistent with the other substantial evidence in [the] case record."  20

C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).  The regulations define a treating physician

as the claimant's "own physician, psychologist, or other acceptable medical source

who provides [the claimant] . . . with medical treatment or evaluation and who has,

or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. §

---

[8] Revisions to the regulations in 2017 included modifying 20 C.F.R. § 404.1527 to
clarify and add definitions for how to evaluate opinion evidence for claims filed
before March 27, 2017, such as Nieves'.  *See* REVISIONS TO RULES REGARDING THE
EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).
Accordingly, this opinion and order applies the regulations that were in effect in
when Nieves' claims were filed in 2012, with the added clarifications provided in the
2017 revisions.

404.1502.  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [are] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative

record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420

(quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.

1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate).  As a result, "the 'treating physician rule' is

inextricably linked to a broader duty to develop the record.  Proper application of

the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly

how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-

7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec.

19, 2012).

To determine how much weight a treating physician's opinion should carry,

the ALJ must consider the "*Burgess* factors" outlined by the Second Circuit: "(1) the

frequen[cy], length, nature, and extent of treatment; (2) the amount of medical

evidence supporting the opinion; (3) the consistency of the opinion with the

remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*,

925 F.3d at 95–96 (citation omitted); *see also Burgess*, 537 F.3d at 129; 20 C.F.R. §

404.1527(c)(2).  This determination is a two-step process.  "First, the ALJ must

decide whether the opinion is entitled to controlling weight." *Estrella*, 925 F.3d at

95.  Second, if, based on these considerations, the ALJ declines to give controlling

weight to the treating physician's opinion, the ALJ must nonetheless

"comprehensively set forth reasons for the weight" ultimately assigned to the

treating source.  *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's

opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R.

§ 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling

weight, "[a]n ALJ's failure to 'explicitly' apply these '*Burgess* factors' when

[ultimately] assigning weight at step two is a procedural error."  *Estrella*, 925 F.3d

at 96 (quoting *Selian*, 708 F.3d at 419–20).  The regulations require that the SSA

"always give good reasons in [its] notice of determination or decision for the weight"

given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d

Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not

hesitate[d] to remand [cases] when the Commissioner has not provided good

reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d

at 33) (second and third alteration in original) (internal quotation marks omitted).

Crucially, "an ALJ's failure to apply the correct legal standard constitutes

reversible error if that failure might have affected the disposition of the case."

*Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*,

546 F.3d 260, 265 (2d Cir. 2008)).  However, the Court need not remand the case if

the ALJ only committed harmless error*, i.e.*, where the "application of the correct

legal principles to the record could lead only to the same conclusion." *Zabala v.

Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v.

Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the

20

claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence' of record." *Id*. (citing 20 C.F.R. §

404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition

to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location,
> duration, frequency, and intensity of the individual's pain
> or other symptoms; 3. [f]actors that precipitate and
> aggravate the symptoms; 4. [t]he type, dosage,
> effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other
> symptoms; 5. [t]reatment, other than medication, the
> individual receives or has received for relief of pain or
> other symptoms; 6. [a]ny measures other than treatment
> the individual uses or has used to relieve pain or other
> symptoms (e.g., lying flat on his back, standing for 15 to
> 20 minutes every hour, or sleeping on a board); and 7.
> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July

2, 1996)).

### B. The ALJ's Decision

On February 3, 2020, in a 19-page decision, the ALJ found that Nieves was

not disabled prior to, but became disabled on, August 8, 2019. AR at 1445. At step

one of the five-step inquiry, the ALJ found that Nieves had not engaged in

substantial gainful activity since her alleged disability onset date of March 5, 2011.

*Id*. at 1429. At step two, the ALJ found that Nieves had the following severe

impairments: anemia, gastroesophageal reflux disease ("GERD") and gastric pain

post gastric bypass surgery with ulcers, post arthroscopic repair right shoulder,

varicose veins, depression, and anxiety. *Id*. at 1429–30. He then found that beginning on August 8, 2019, Nieves additionally had the severe impairment of carpal tunnel syndrome. *Id*. at 1430.

At step three, the ALJ found that Nieves did not have "an impairment or combination of impairments" that met the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. In so finding, the ALJ did not explicitly rely on one or more physician evaluations, but rather reviewed the record and determined that the criteria for physical impairments were not met. *Id*. at 1430–31. With respect to her mental impairments, the ALJ relied primarily on the psychiatric consultative examination to find that Nieves did not satisfy the "paragraph B" criteria because she had no more than a mild limitation in adapting or managing herself, and no more than moderate limitations in: understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace. *Id*. at 1431–32. The ALJ also determined that Nieves did not satisfy the "paragraph C" criteria based on a lack of evidence to demonstrate satisfaction of the regulatory requirements. *Id*. at 1432.

Prior to evaluating step four, the ALJ determined Nieves' RFC and found that prior to August 8, 2019, she could perform sedentary work with the following limitations: no reaching overhead with the dominant right arm; no more than frequent fingering, feeling, and handling bilaterally; no work on ladders, ropes, or scaffolds; occasional use of ramps and stairs; occasional balancing, stooping, crouching, crawling, and kneeling; and no work at unprotected heights or around

dangerous machinery.  *Id.* at 1433.  She was limited to simple routine work not done at a production rate pace, and could interact with and react appropriately with supervisors, co-workers, and the general public on an occasional basis.  *Id.*

In making this finding, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and also considered opinion evidence.  *Id.* The ALJ further found that Nieves' medically determinable impairments could reasonably be expected to cause the symptoms alleged, but that her statements about the intensity, persistence, and limiting effects of her symptoms were "inconsistent" with the medical evidence, which reflected "a routine and conservative treatment history, and generally benign physical and mental health examinations."  *Id.* at 1434.

The ALJ then assessed the medical opinion evidence.  *Id.* at 1435–42.  The ALJ gave "little weight" for the entire period at issue to Dr. Sanjay Upadhyay's October 27, 2010 Treating Physician's Wellness Plan Report, which opined Nieves would be unable to work for at least 12 months.  *Id.* at 1435.  The ALJ noted that although Dr. Upadhyay was Nieves' PCP for "several years," his opinion concerned an issue reserved for the Commissioner.  *Id.*  Additionally, the ALJ noted that Dr. Upadhyay provided neither an explanation as to why Nieves could not work nor treatment records from 2010, and his opinion predated the alleged onset date.  *Id.* Next, the ALJ assigned "partial weight" for the entire period at issue to Dr. John Clive Spiegel's Psychiatric Psychological Impairment Questionnaire from November

5, 2012.  *Id.*  He observed that Dr. Spiegel only noted moderate limitations at most, but indicated that the claimant would be absent more than three times per month with no specific reason for missing those days; further, "nothing objective in the record" supported the decompensation in work-like settings that Dr. Spiegel indicated.  The ALJ also noted that Nieves' "mental status examinations have been generally normal, or benign at worst."  *Id.*

After a review of Dr. Jose T. Bonoan's medical assessments, the ALJ gave Dr. Bonoan's late 2012 Multiple Impairment Questionnaire "little weight" for the entire period at issue.  *Id.* at 1436.  Dr. Bonoan had "opined that the claimant needs to take unscheduled breaks to rest at unpredictable intervals often during an eight-hour working day and is likely to be absent from work more than three times a month."  *Id.*  The ALJ recognized that Dr. Bonoan had been regularly treating Nieves every three to six months since June 2010, but the ALJ nonetheless assigned little weight to his opinion because: (1) he discussed limitations due to pain but then indicated that pain had been "completely relieved without side effects;" (2) he indicated limitations due to mental health although he did not treat Nieves for mental health issues; and (3) there was "no objective evidence" to support his opinion that Nieves would miss work more than three times per month as she was "not constantly in and out of the emergency department or hospitals."  *Id.*  The ALJ then gave "partial weight" to Dr. Bonoan's 2014 opinion for the entire period at issue.  *Id.*  He gave weight to the part of the opinion that noted that her anemia was stable at the time of the opinion but no weight to Dr. Bonoan's assessment of the

24

impact of anxiety on Nieves or his opinion that she was temporarily unemployable for at least 12 months.  *Id.*

The ALJ then turned to the consultative opinions.  He first assessed Dr. David Mahony, Ph.D.'s January 23, 2012 consultative examination in which Dr. Mahoney diagnosed Nieves with moderate major depressive disorder and cognitive disorder not otherwise specified.  *Id.*  The ALJ assigned this opinion "partial weight" for the entire period at issue.  *Id.*  While the ALJ noted that Dr. Mahony is not a treating source and examined Nieves only once, he found the opinion to be "generally consistent with most of [Nieves'] mental health treating records," although it "would appear from those records that at times[,] [Nieves might have been] more limited than was opined here."  *Id.*

Next, the ALJ assigned "partial weight" for the entire period at issue to Dr. Iqbal Teli's opinion resulting from a January 23, 2013 internal medicine consultative examination.  *Id.* at 1437.  He explained that Dr. Teli examined Nieves once and did not account for fatigue when her anemia is not stable.  *Id.*  Dr. Teli opined that she had no physical restrictions except mild restrictions on prolonged standing and walking due to varicosity of the leg.  *Id.*

The ALJ assigned "partial weight" for the entire period at issue to state agency psychological consultant Dr. E. Kamin's opinion.  *Id.*  Dr. Kamin was a non-examining source who reviewed "some of" Nieves' records and found her to have severe depression and anxiety, but only a mixture of mild to moderate difficulties. *Id.*  Finally, the ALJ gave "no weight" to the state agency Single Decision Maker

("SDM") assessment based on agency policy that ALJs not consider and address SDM findings, as they are non-medical sources.  *Id.*

Following the consultative opinions, the ALJ reviewed the opinions of four additional sources.  First, he assigned "no weight" for the entire period at issue to two opinions from Sharon Pluskalowski, a Licensed Clinical Social Worker ("LCSW")–R.  *Id.*[9]  Pluskalowski's first opinion was provided on July 25, 2013 and the second, which was in substance "the same," was provided on September 24, 2013.  *Id.*  The ALJ observed that although Pluskalowski had treated Nieves "at least every few months since 2011," she could not be considered a treating source as an LCSW.  *Id.*  Additionally, the ALJ explained that Pluskalowski's opinion that Nieves' symptoms would impede her ability to work is an issue reserved for the Commissioner, and further that her opinion with respect to Nieves' difficulty interacting with peers was "vague" and not referred to as a specific issue in treatment records.  *Id.*

Second, the ALJ assessed five opinions from Dr. Alexander Alerte, M.D. With respect to the October 10, 2014 Mental Impairment Questionnaire, the ALJ assigned "partial weight" for the entire period at issue "because it [was] from a treating source who ha[d] been seeing [Nieves] about once a month since June 2011,

---

[9] An LCSW–R is a licensed clinical social worker who is recognized in New York State as a "reimbursable psychotherapist" after fulfilling the requirements for supervised experience providing psychotherapy.  *License Requirements - Licensed Clinical Social Worker "R" Psychotherapy Privilege*, NEW YORK STATE EDUCATION DEPARTMENT, OFFICE OF THE PROFESSIONS, http://www.op.nysed.gov/prof/sw/lcswprivilege.htm (last visited March 24, 2022).

but the opinion did not provide clinical findings to support [it] other than 'depression and questionable evidence of perceptual disturbances.'" *Id.* at 1438. The ALJ further remarked that the questionnaire used a "deceptively set-up check box form," and that the portion of the opinion noting absences from work was not supported by either the moderate functional limitations found or the treating records, which showed symptoms to be "largely controlled medically." *Id.* The ALJ then gave "little weight" to Dr. Alerte's September 29, 2015 Wellness Plan Report in which Dr. Alerte opined that Nieves would be unable to work for at least 12 months. The ALJ explained that such a determination is reserved for the Commissioner, and that Dr. Alerte described Nieves' mental condition in "general and vague comments." *Id.*

The ALJ then gave "little weight" to Dr. Alerte's November 25, 2015 Summary Mental Assessment for the entire period at issue, in which he opined that Nieves was likely to be absent from work as a result of her impairments or treatment two to three times per month and that her symptoms and related limitations applied as far back as March 5, 2011. Id. at 1438–39. In so doing, the ALJ noted that (1) the listed clinical findings, signs, and/or symptoms were "benign"; (2) Nieves had fair attention and concentration and adequate perception as well as reality testing; (3) these findings were inconsistent with mostly moderate or moderate-to-marked limitations; and (4) the treatment records reflected "generally controlled mental health symptoms" that did not support more than moderate limitations in mental functioning. Id. at 1439. Next, the ALJ assigned

"little weight" to Dr. Alerte's updated Mental Impairment Questionnaire from March 29, 2017 in which he noted "generally increased limitations" and that Nieves "would still likely be absent from work two to three times per month."  The ALJ explained that this assessment also used a deceptive check box form, and that according to the form, Nieves "simultaneously improved in some areas while declining in others," which the treatment records did not support.  *Id.*  Finally, the ALJ gave "little weight" to Dr. Alerte's November 4, 2019 Medical Source Statement for the entire period at issue due to inconsistencies among this opinion, Dr. Alerte's past opinions, and the record.  *Id.* at 1439–40.

Third, the ALJ assigned "no weight" to the November 24, 2015 New York State Office of Temporary and Disability Assistance opinion that Nieves was unable to work due to a medical issue, because such a determination is reserved for the Commissioner, and the opinion was provided for a context different than the SSA.  *Id.* at 1440.  Fourth, the ALJ assigned "partial weight" to the November 8, 2019 Medical Source Statement from FNP Michele Tyler.  *Id.* at 1440–41.  In her statement, Tyler opined that Nieves would be absent from work about three times a month and that her condition existed and persisted with the stated restrictions at least since 2018.  *Id.* at 1441.  The ALJ assigned partial weight to Tyler's opinion as she is not an acceptable medical source and treated Nieves "only every three months" since February 2018, and because elements of her opinion were not well defined or explained.  *Id.*

28

Finally, the ALJ gave the Global Assessment of Function ("GAF") scores in the record "little weight" for the entire period at issue because they are "not designed for adjudicative determinations," "may indicate problems that do not necessarily relate to the ability to hold a job," and in this case, other evidence provided more information and was given more weight. *Id.*

At step four, the ALJ found that Nieves was unable to perform any past relevant work. *Id.* at 1443. At step five, after considering the vocational expert's testimony and Nieves' demographic information, the ALJ concluded that prior to August 8, 2019, Nieves could perform jobs such as document preparer, addresser, and surveillance system monitor, which existed in significant numbers in the national economy. Id. at 1444. Accordingly, the ALJ concluded that Nieves was not disabled prior to August 8, 2019. *Id.* at 1445.

### C. Analysis

Nieves argues that this case should be remanded again because: (1) the ALJ failed to properly weigh the treating physicians' opinion evidence; (2) the ALJ's credibility finding is not supported by substantial evidence; (3) the ALJ failed to consider Nieves' side effects from medications; (4) the ALJ's RFC finding was not supported by substantial evidence; and (5) the ALJ's RFC finding was inconsistent with his other findings. Pl. Mem. at 24, 31, 33, 34, 36. The Commissioner responds that the ALJ's decision should be affirmed because the ALJ properly evaluated the medical evidence in determining Nieves' RFC, and properly evaluated her

subjective complaints.  Def. Mem. at 20, 29.  For the reasons which follow, the Court

concludes that remand is warranted.

### 1. The ALJ Failed to Fully Develop the Record

As a preliminary matter, the ALJ failed to fully develop the record regarding

Nieves' physical impairments.  To satisfy the duty to develop the record, "an ALJ

should have medical evidence from a medical source with a sufficiently persuasive

opinion noting the existence and severity of a disability."  *Brooks v. Kijakazi*, No.

20-CV-7750 (GBD) (JLC), 2022 WL 213994, at *17 (S.D.N.Y. Jan. 25, 2022) (cleaned

up), *adopted by* 2022 WL 715424 (Mar. 10, 2022).

Here, despite the ALJ according no more than "partial weight" to any one of

the treating physician assessments on record (as discussed in the next section), the

ALJ did not seek functional assessments from two of Nieves' other ongoing treating

health care providers, Drs. Hilary Hertan and Ian Yeng-Yang, or an update of Dr.

Upadhyay's 2010 assessment.  An ALJ's duty to develop the record is

> even more important when the information concerns a
> claimant's treating source . . . because treating sources
> are likely to be the medical professionals most able to
> provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be
> obtained from the objective medical findings alone or from
> reports of individual examinations.

*Romero v. Comm'r of Soc. Sec.*, No. 18-CV-10248 (KHP), 2020 WL 3412936, at *11

(S.D.N.Y. June 22, 2020) (cleaned up).

Where, as here, an ALJ must determine an RFC, his failure to request a

functional assessment when any such assessments in the record are insufficient

constitutes a failure of his duty to develop the record. *See id.*, at *13 (collecting

cases). If there is a gap in the record, the ALJ cannot use "the absence of evidence

to draw an adverse inference." *Ligon v. Astrue*, No. 11-CV-0162 (JG), 2012 WL

6005771, at *20 (E.D.N.Y. Dec. 3, 2012). Here, notable gaps in the record exist with

respect to evidence from a medical source with a "sufficiently persuasive opinion"

regarding Nieves' anemia and GI disorders, because the ALJ did not accord more

than partial weight to any of the treating physicians who submitted a functional

assessment. *See Brooks,* 2022 WL 213994, at *17.

First, the ALJ "failed to obtain or attempt to obtain the records" of Dr. Yeng-

Yang. *Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999). The record reflects that Dr.

Yeng-Yang saw Nieves at least 14 times between December 2012 and January 2017.

*See* AR at 1354–78, 1411–13. Dr. Yeng-Yang, a Chief of Pain Medicine, began

treating Nieves on December 19, 2012 "for chronic intermittent abdominal pain."

*Id.* at 1386. In July 2014, he noted that Nieves was "fully engaged in a spectrum of

appropriate [treatments] but with inadequate response." *Id.* at 1364. Second, the

ALJ failed to obtain an assessment from Dr. Hertan even though not only are his

treatment notes in the record, but Nieves had mentioned him during the hearing as

her GI doctor whom she had seen four months prior to the hearing and who was

actively involved in prescribing her medication for abdominal pain. *Id.* at 1486–88;

*see Corporan v. Comm'r of Soc. Sec.,* No. 12-CV-6704 (JPO), 2015 WL 321832, at *27

(S.D.N.Y. Jan. 23, 2015) ("The ALJ here had a duty to develop [the claimant's]

record up to the hearing, which includes attempting to obtain evidence [the ALJ] learned about during the hearing.") (cleaned up).

Third, the ALJ did not seek an updated assessment from Dr. Upadhyay with respect to Nieves' anemia.  Dr. Upadhyay's only assessment in the record was accorded little weight in part because it was made in 2010, prior to the alleged date of onset, though the record reflects that he continued to treat Nieves through at least 2017.  *See, e.g.,* AR at 197, 1280, 1294, 1335–42, 1346–48 (treatment notes from Dr. Upadhyay through October 27, 2015, noting on October 9, 2015 Nieves' "moderate to severe anemia" and a referral for iron infusions), 1873 (treatment notes from Dr. Upadhyay on March 3, 2017 noting "chronic fatigue" and anemia); *see also Thomas M.N. v. Comm'r of Soc. Sec.*, No. 5:19-CV-360 (GTS), 2020 WL 3286525, at *5 (N.D.N.Y. Jun. 18, 2020) (directing ALJ to further develop record with updated opinion evidence to clarify functional limitations).  All three of these treating physicians may have been able to comment on Nieves' pain management, energy levels, and the impact of her chronic physical ailments on her ability to function in a work setting.

Despite the regular treatment these three physicians provided to Nieves and the lack of persuasive opinions from other treating sources, it is not clear on the record before the Court whether the ALJ ever sought the necessary opinions.  *See, e.g., Starr v. Comm'r of Soc. Sec.*, No. 20-CV-4484 (GWG), 2022 WL 220408, at *5 (S.D.N.Y. Jan. 26, 2022) (ALJ must make "every reasonable effort" to obtain from an individual's treating health care provider all medical evidence necessary to

properly make disability determination).  Because the ALJ's duty to develop the

record on behalf of a claimant is a threshold duty, "[r]emand is appropriate when

the ALJ fails to discharge this duty," and is thus appropriate here.  *Acosta Cuevas v.*

*Comm'r of Soc. Sec.,* No. 20-CV-502 (AJN) (KHP), 2021 WL 363682, at *10 (S.D.N.Y.

Jan. 29, 2021), *adopted by* 2022 WL 717612 (Mar. 10, 2022).

### 2. The ALJ Failed to Properly Apply the Treating Physician Rule

Nieves argues that the ALJ erred by not properly weighing the treating

physicians' opinions.  Pl. Mem. at 24–25.  The Commissioner counters that the ALJ

considered the relevant factors and had good reasons for his decision not to give

weight to certain opinions, in particular noting that opinions may be given less

weight if they are internally inconsistent.  Def. Mem. at 23, 25.  The Court agrees

with Nieves.

An ALJ must first determine whether a treating source's opinion is entitled

to controlling weight.  *See Estrella*, 925 F.3d at 95 (quoting *Burgess*, 537 F.3d at 128

("[T]he opinion of a claimant's treating physician as to the nature and severity of

[an] impairment is given 'controlling weight' so long as it 'is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record'")).  If the ALJ

determines the treating source's opinion is not entitled to controlling weight, he

must then "explicitly consider" the *Burgess* factors to establish how much weight, if

any, to assign it.  *Id.* at 95–96 (cleaned up). Specifically, an ALJ is required to

consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the

amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.*

Here, the ALJ gave none of the treating physicians' opinions controlling weight. At the second step, while the ALJ considered the frequency and length of treatment with Drs. Spiegel, Bonoan, and Alerte, he did not properly consider the second or third *Burgess* factors when he failed to consider how those opinions were consistent with others in the record, and when he made a number of unsupported findings with respect to the amount of medical evidence supporting the opinions of Drs. Spiegel and Alerte.

### a. Consistency Among Medical Opinions

Throughout his RFC determination, the ALJ cited a lack of medical support for the physicians' opinions concerning Nieves' inability to work. In so finding, he improperly failed to consider the opinions' consistency with one another. Courts in this District have found that "an ALJ's failure to consider the consistency of the physicians' opinions with each other . . . constitutes legal error." *Williams v. Saul*, No. 19-CV-10443 (AT) (JLC), 2020 WL 6385821, at *13 (S.D.N.Y. Oct. 30, 2020), *adopted sub nom.* by *Williams v. Comm'r of Soc. Sec.*, 2020 WL 7337864 (Dec. 14, 2020) (citation omitted).

Here, the ALJ did not comply with this obligation. As the ALJ acknowledged, four treating physicians concluded on numerous occasions over a nine-year period that Nieves' ailments would impact her ability to work: (1) in 2010, Dr. Upadhyay

concluded that she was unable to work for at least 12 months; (2) in 2012, Dr. Spiegel opined that she would be absent from work more than three times a month; (3) Dr. Bonoan concluded in one opinion that she was likely to be absent from work more than three times a month and in a second opinion that she was temporarily unemployable for at least 12 months; and (4) in 2014, 2015, and 2017, Dr. Alerte opined that she was likely to be absent from work two to three times per month; in 2015 he further opined that she would be unable to work for at least 12 months; and in 2019 he opined that she would be likely to be absent from work more than three times a month. AR at 1435–40. While not treating physicians, LCSW-R Pluskalowski also opined multiple times that Nieves' symptoms would impede her ability to work, and FNP Tyler likewise opined that she was likely to be absent from work about three times a month. *Id.* at 1437–41.

The ALJ never referred to the consistency with which these six different examining medical sources each concluded, based on their treatment of Nieves, that she would be unable to work or would be absent at least two to three times per month. Thus, his accordance of little or partial weight for the various of opinions of Drs. Bonoan, Spiegel, and Alerte was improper to the extent that the ALJ did not address their consistency with one another as part of a consistency analysis under the third *Burgess* factor. Because the failure to "give any weight to the fact that [certain physicians'] opinions are consistent with other medical evidence in the record because *they are consistent with one another*" constitutes legal error, remand

is warranted on this basis as well.  *Denver v. Berryhill*, 19-CV-1312 (AJN) (KHP),

2020 WL 2832752, at *2 (S.D.N.Y. Jun. 1, 2020).

### b. Inadequate Consideration of the Medical Evidence

In his consideration of medical evidence to support the opinions of Drs.

Spiegel and Alerte, the ALJ reached unsupported conclusions about the evidence in

the record, and failed to account for evidence consistent with the opinions.

Although an ALJ must consider evidence that contradicts the opinion of a treating

physician, he must also account for evidence supporting that opinion.  *See, e.g.,*

*Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 266 (S.D.N.Y. 2016).

First, the ALJ assigned partial weight to Dr. Spiegel's November 2012

opinion after concluding that Nieves' "mental status examinations [had] been

generally normal, or benign at worst."  AR at 1435.  The ALJ cited to a variety of

records in making this determination, but did not point to any specific evidence that

a medical expert referred to Nieves' examinations as "benign" or "generally normal."

*Id.*  Such a characterization thus amounted to an improper substitution of his own

lay opinion.  *See, e.g., Avrutskaya v. Comm'r of Soc. Sec.*, No. 18-CV-6267 (PKC),

2020 WL 1550252, at *6 (E.D.N.Y. Mar. 31, 2020) (ALJ's characterization of

symptoms as "moderate" when medical opinion did not describe symptoms as such

amounted to improper medical conclusion and substitution of ALJ's own lay

opinion); *see also McGrath v. Comm'r of Soc. Sec.*, No. 20-CV-3042 (FB), 2021 WL

5281317, at *2 (E.D.N.Y. Nov. 12, 2021) ("Because the ALJ is a layperson, not a

doctor, she is not permitted to interpret raw medical information into a

determination about [the claimant's] medical condition without the assistance of a medical professional's insight.").

Likewise, after recognizing that Dr. Alerte had seen Nieves about once a month since June 2011, the ALJ accorded partial weight to Dr. Alerte's October 2014 opinion, and little weight to the September 2015, November 2015, March 2017, and November 2019 opinions.  AR at 1438–40.  As he had done with Dr. Spiegel's opinion, the ALJ improperly substituted his own judgment for that of Dr. Alerte's when he found that: (1) the treating records showed that Nieves' psychiatric symptoms were "largely controlled medically" in 2014; (2) moderate limitations would not support the opinion that Nieves would be absent from work; (3) the listed clinical findings, signs, and/or symptoms in the November 2015 opinion were "benign" without a medical opinion to that effect; (4) the mental health symptoms in treatment records "support[ed] no more than moderate limitations in the areas of mental functioning" even though Dr. Alerte determined that some were "moderate-to-marked;" and (5) numerous signs and symptoms were endorsed that were not mentioned in the treating records.  *Id.  See Johnson v. Kijakazi*, 20-CV-6763 (LJL), 2021 WL 5087926, at *8 (S.D.N.Y. Nov. 1, 2021) (ALJ erred in asserting that "significant limitations, including time off task and absences" indicated in the physician's opinion were not supported by medical evidence because the "broad conclusion made by the ALJ . . . made in the face of significant medical evidence" of pain and other symptoms was "not explained").

The ALJ's failures are particularly egregious, where, as here, the ALJ did not consider Nieves' own complaints and history alongside any "objective" evidence. *See Rodriguez v. Kijakazi*, No. 20-CV-6829 (JLC), 2021 WL 5292751, at *17 (S.D.N.Y. Nov. 15, 2021) (citing *Anauo v. Colvin*, No. 15-CV-933 (MAT), 2016 WL 7320068, at *6 (W.D.N.Y. Dec. 16, 2016) ("Indeed, whether a medical provider is dealing with mental or physical impairments, consideration of a patient's report of complaints, or history, as an essential diagnostic tool, is a medically acceptable clinical and laboratory diagnostic technique.") (internal quotation marks omitted); *Rankov v. Astrue*, No. 11-CV-2534 (CBA), 2013 WL 1334085, at *10 (E.D.N.Y. Mar. 30, 2013) ("A physician's reliance on the plaintiff's subjective complaints hardly undermines his opinion as to [the plaintiff's] functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool.") (internal quotation marks and alteration omitted)).[10]

Next, the ALJ cited to Dr. Alerte's use of a "deceptively set-up check box form" as part of the rationale for the weight assigned to his opinions. *Id.* at 1438–39. The Second Circuit recently determined that it is "erroneous" to assign little

---

[10] Judge Wang noted in her remand decision in this case that with regard to the low weight given to treating physicians' opinions, "several factors, including specialization, length of treatment, and frequency of examinations, medical support and consistency with the record as a whole would seem to point in the other direction." *Id.* at 1588. As she determined, "it is not apparent from the record that the treatment notes [of Nieves' treating physicians] are inconsistent with plaintiff's psychiatrists' opinions regarding plaintiff's inability to work . . . it was thus improper for Judge Grossman to discount plaintiff's treating psychiatrists' opinions on this basis." *Id.* at 1589. So too here was it improper for the ALJ to discount Dr. Alerte's November 2015 opinion largely on the asserted basis that it was "inconsistent" with the underlying treatment records. *See id.* at 1439.

weight to a treating physician's opinion based on the use of a checkbox form.
*Colgan*, 22 F.4th at 361–62 ("physician's medical opinion cannot be discounted by
an ALJ based on the naked fact that it was provided in a check-box form").  Here,
the ALJ concluded that the checkboxes used by Dr. Alerte were "deceptively" set-up
because the forms "combined none and mild for the check boxes" which "could lead
to confusion."  AR at 1438.; *see also id.* at 1232, 1276, 1420.  Further, the ALJ
observed that Dr. Alerte's various opinions with respect to Nieves' restrictions are
"inherently in conflict" because different forms purport to cover "much of" the same
time period but reflect changed positions on the extent of her limitations.  *Id.* at
1440.  When "[the] record is unclear, the Commissioner has an affirmative duty to
'fill any clear gaps in the administrative record' before rejecting a treating
physician's diagnosis."  *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129);
*see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek
additional information from treating physician if clinical findings are inadequate).
Even though the weight the ALJ gave to Dr. Alerte's opinion did not depend entirely
on his use of a checkbox form, to the extent the checkbox form or change in dates
caused actual confusion for the ALJ, the appropriate course of action would have
been to seek additional information from Dr. Alerte to fill any gaps.

Finally, the ALJ relied on his own unsupported assessment of what he
considered to be Nieves' "conservative treatment."  For instance, the ALJ found,
without citation, that "[d]espite [Nieves'] limitations, [she] was capable of
performing basic work activities mentally and physically as evidenced by generally

normal mental status examinations, and conservative treatment." AR at 1442. The determination that Nieves' mental status examinations were "generally normal" and that she received "conservative treatment" amounted to another improper substitution of the ALJ's opinion for that of a medical expert. *See McGrath*, 2021 WL 5281317, at *2.

Moreover, the fact that a doctor has pursued what an ALJ characterizes as "conservative treatment" is not a good reason to assign an opinion little weight. *See, e.g., Cohen-Aikens v. Saul*, 19-CV-4443 (SDA), 2020 WL 3126172, at *12 (S.D.N.Y. Jun. 13, 2020). As the Second Circuit noted in *Burgess*, an ALJ "may not impose [his] . . . notion[ ] that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered . . . a circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion." *Burgess,* 537 F.3d at 129 (citation omitted). Moreover, as in *Cohen-Aikens*, so too here does the Court question whether Nieves' treatment regimen is appropriately characterized as "conservative." *Cohen-Aikens,* 2020 WL 3126172, at *12 (cleaned up). In this case, the record reflects that Nieves had undergone at least eight blood transfusions, received weekly B12 injections, and began weekly Venofer IV infusions as of June 2016. AR at 1387. Between June 2011 and February 2019, Nieves had at least 11 visits to the emergency room, surgeries, or hospital stays. *Id.* at 765 (June 2011), 760 (September 2011), 723 (October 2011), 666 (November 2011), 920 (September 2012 surgery), 1951 (August 2015), 138 (July 2017 ablation),

40

1857 (June 2017), 1728 (two surgeries in 2018), 1771 (February 2019 reports of

recent hospitalization).  Throughout the pendency of her applications, Nieves had

been prescribed a wide-ranging number of medications for both physical and mental

ailments, which included two antipsychotic agents at "maximal doses" such that Dr.

Spiegel would not alter the medication to address continued needs.  *See, e.g., id.* at

1003; *Cohen-Aikens,* 2020 WL 3126172, at \*12 (citing *Scognamiglio v. Saul*, 432 F.

Supp. 3d 239, 249–50 (E.D.N.Y. 2020) (treatment consisting of physical therapy,

acupuncture, pain medication and epidural injections incorrectly characterized as

conservative); *Wood v. Berryhill*, No. 16-CV-570 (MAT), 2018 WL 5276081, at \*4

(W.D.N.Y. Oct. 24, 2018) (plaintiff's progressing treatment including pain

medication and epidural injections not conservative)).

In sum, the ALJ's reliance on "unsupported conclusions," as well as his

failure to consider the consistency of the opinions with one another, each render his

determinations to accord partial or little weight to the treating physicians' opinions

legal error.  *See Johnson*, 2021 WL 5087926, at \*7–8.[11]

---

[11] The ALJ also improperly dismissed the opinion of LCSW-R Pluskalowski.  AR at
1437.  While the ALJ correctly determined that Pluskalowski's opinion was not
entitled to controlling weight because it was not from an acceptable medical source,
he failed to consider that a nonmedical treating source may still be given controlling
weight if it does not contradict the evidence in the record.  *See, e.g., Baldwin v.
Astrue*, No. 07-CV-6958 (RJH) (MHD), 2009 WL 4931363, at \*22–23 (S.D.N.Y Dec.
21, 2009).  Further, social workers and therapists are "other sources" whose
opinions can be considered to evaluate "the severity of [an] impairment[ ] and how it
affects [a claimant's] ability to work." 20 C.F.R. § 404.1513(d).  SSR 06–03p, which
was in effect at the time of Nieves' applications, directs ALJs to "use the same
factors for the evaluation of the opinions of acceptable medical sources to evaluate
the opinions of medical sources who are not acceptable medical sources, such as
licensed social workers." SSR 06–03p; *see also Franklin v. Colvin*, No. 16-CV-6478

### 3. The ALJ's RFC Determination Was Not Supported by Substantial Evidence

In addition to the deficiencies in the ALJ's decision already identified, the ALJ's RFC determination was not supported by substantial evidence in the record. The ALJ found that prior to August 8, 2019, Nieves could perform sedentary work with the following limitations: no reaching overhead with the dominant right arm; no more than frequent fingering, feeling, and handling bilaterally; no work on ladders, ropes, or scaffolds; occasional use of ramps and stairs; occasional balancing, stooping, crouching, crawling, and kneeling; and no work at unprotected heights or around dangerous machinery. *Id*. at 1433. He also found that she was limited to simple routine work not done at a production rate pace and could interact with and react appropriately with supervisors, co-workers, and the general public on an occasional basis. *Id*.

---

(ALC), 2018 WL 1449524, at *7 (S.D.N.Y. Mar. 23, 2018) ("Opinions from other sources should be evaluated based on the same factors for the evaluation of the opinions of acceptable medical sources") (cleaned up). Notably, the ALJ implicitly acknowledged this when he chose to accord "partial weight" to FNP Tyler's opinion, even though she is likewise not an approved medical source. AR at 1441. In the case of psychiatric impairments, the length and frequency of mental health treatment is "especially relevant in evaluating a claimant's psychiatric impairments." *Gorman v. Colvin*, No. 13-CV-3227 (JG), 2014 WL 537568, at *6 (E.D.N.Y. Feb. 10, 2014). Thus, Pluskalowski's experience with Nieves may be particularly important to the ALJ's overall determination. AR at 1437. However, the ALJ did not provide sufficient reasons for assigning Pluskalowski's opinions "no weight," and he excluded from his discussion her November 24, 2014 opinion. *See id*. at 1269. Most importantly, he did not properly account for the length and frequency of Nieves' treatment relationship with Pluskalowski. Although he noted Pluskalowski had treated Nieves since 2011 "at least every few months," at the time of the opinions she provided, Pluskalowski in fact saw Nieves "weekly." *Id*. at 1094–95, 1437.

The existence of substantial evidence to support an RFC determination cannot be proven by an absence of limitations, but rather must be shown through evidence of what the claimant can do that meets the RFC asserted. *See, e.g., Rosa*, 168 F.3d at 80–82. "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Vellone on behalf of Vellone v. Saul*, No. 20-CV-261 (RA), 2021 WL 2801138, at *2 (S.D.N.Y. Jul. 6, 2021) (quoting *Donofrio v. Saul*, No. 18-CV-9968 (ER), 2020 WL 1487302, at *8 (S.D.N.Y. Mar. 27, 2020)). In *Rosa*, the Second Circuit found that the ALJ had mistakenly permitted the Commissioner to satisfy her burden of proof without requiring affirmative evidence demonstrating the claimant's RFC to meet the demands of sedentary work. *Rosa*, 168 F.3d at 80–81. The same is true here.

The only affirmative evidence that Nieves would be capable of the physical limitations set out in the RFC appears to be found in either FNP Tyler's Medical Source Statement from November 8, 2019, or in Dr. Teli's 2013 consultative examiner's opinion. AR at 940–44, 2167–72, 1437, 1440–41; Def. Mem. at 28–29. Notably, Tyler determined that Nieves could do no more than "occasional" fingering, feeling, and handling bilaterally, but the ALJ only credited this opinion for after the August 8, 2019 disability determination. *Id.* at 1441. In his 2013 opinion, Dr. Teli opined that generally Nieves had "no physical restrictions" except for mild restrictions for prolonged standing and walking due to varicosity of the leg. AR at

943.  However, this opinion can hardly amount to "substantial evidence," given that the ALJ himself only accorded it partial weight, and he noted in particular that it was based on a one-time examination source and did not account for fatigue attributable to when Nieves' anemia is not stable.  *Id.* at 1437.

The ALJ did not cite to any affirmative opinion evidence in the record from a treating physician between 2011 and February 2018 that addressed Nieves' physical abilities to fulfill the stated RFC.  This gap is stark given the extensive record in this case.  For instance, although the Commissioner argues that Dr. Bonoan's "late 2012" opinion "assessed no physical limitations with respect to sitting, walking or standing, or use of the arms," Def. Mem. at 29, the ALJ had concluded that Dr. Bonoan "did not give an opinion as to [Nieves'] ability to sit or stand and walk."  AR at 1436.  Regardless of whether an assessment was made, however, the ALJ assigned "little weight" to this opinion and thus did not substantially rely on it to reach his RFC determination.  *Id.*  Dr. Bonoan's 2014 opinion did not make a physical assessment, and instead reported that Nieves was temporarily unemployable rather than employable.  *Id.* at 1235.  With respect to her mental impairments, the ALJ stated during Nieves' hearing that she had been "getting mental health treatment pretty much throughout this period of time [in question in the application] . . . fairly consistently."  *Id.* at 1485.  However, the ALJ did not cite to those mental health treating providers' opinions as affirmative evidence of Nieves' RFC.

"When the record does not contain a treating physician's opinion(s) on the plaintiff's functional capacity (i.e. an RFC), the duty requires that [the ALJ] sua sponte request that opinion." *Romero*, 2020 WL 3412936, at * 12 (cleaned up). Without the benefit of a persuasive functional assessment of Nieves' impairments after the alleged onset date by a treating health care provider, the RFC was instead largely supported by consultative opinions and the ALJ's interpretation of the treatment notes as "generally normal" and "benign." *See, e.g.,* AR at 1435.  An ALJ commits legal error when, as here, he "fill[s] th[e] evidentiary void with his own medical judgment and interpretation of [the medical] records." *Lee v. Saul*, No. 19-CV-9451 (CS) (JCM), 2020 WL 5362619, at *17 (S.D.N.Y. Sept. 8, 2020) (collecting cases); *see also Dean C. v. Comm'r of Soc. Sec.*, No. 19-CV-1165 (DB), 2021 WL 1558401, at *8 (W.D.N.Y. Apr. 21, 2021) (ALJ not permitted to use own lay interpretation of record to develop claimant's physical RFC); *McGrath,* 2021 WL 5281317, at *2 ("Because the ALJ is a layperson, not a doctor, she is not permitted to interpret raw medical information into a determination about [the claimant's] medical condition without the assistance of a medical professional's insight."). Thus, the ALJ's failure to develop the record (as discussed above), coupled with his failure to obtain a functional assessment that affirmatively included Nieves' ability to sit, stand, walk, and complete other required tasks during the workday, renders his RFC determination to have been based upon an incomplete record.

### 4. The ALJ's Errors Were Not Harmless

Finally, the ALJ's failures to properly apply the treating physician rule, assess the medical evidence, and fully develop the record were not harmless. The proper application of the treating physician rule is potentially dispositive in determining whether Nieves is disabled within the meaning of the Act. *See, e.g., Roman v. Saul,* No. 19-CV-3688 (JLC), 2020 WL 4917619, at *20 (S.D.N.Y. Aug. 21, 2020) (analysis not harmless error because had ALJ credited treating physician's opinion, it may have resulted in conclusion that claimant could not work). First, the failure to fully develop the record is not harmless because the treatment notes from the doctors who treated Nieves over the course of many years indicated significant ailments that could potentially have impacted Nieves' ability to work. For instance, Dr. Upadhyay treated Nieves' "chronic fatigue" and "severe anemia," and Dr. Yeng-Yang treated Nieves for "chronic intermittent abdominal pain." AR at 1386, 1873. Without any other persuasive treating physician opinions, the ALJ improperly relied on his own assessment of the treatment records and that of consultative examiners.

Next, four different treating physicians and two additional sources each opined that Nieves would be temporarily unemployable for 12 months, absent from work at least two to three days per month, or both. AR at 1435–41. Even though Nieves' ability to work is a determination reserved for the Commissioner, these opinions are particularly significant in light of the VE's testimony that no more than one absence per month, including days in which an individual needs to miss a

substantial part of the day, is considered acceptable in full-time competitive employment. *Id.* at 1502–03. In fact, the ALJ recognized that whether Nieves would be able to "adequately maintain attendance for a competitive job" would be important to his decision. AR at 1505. However, he discounted all of the treating physicians' opinions as to her ability to maintain attendance at work. Had the ALJ credited any of the aforementioned opinions, he would have found that there were no jobs in the national economy that Nieves could perform. Accordingly, the ALJ's failure to properly assess the medical evidence was not harmless. *See Pines v. Comm'r of Soc. Sec.*, No. 13-CV-6850 (AJN) (FM), 2015 WL 872105, at *10 (S.D.N.Y. Mar. 2, 2015) (internal quotation marks and citation omitted) (ALJ's analysis of treating physician's opinion was not harmless error because VE "essentially testified that if these opinions were adopted, [the claimant] would be unable to work"), *adopted by* 2015 WL 1381524 (Mar. 25, 2015).

### III. CONCLUSION

For the foregoing reasons, Nieves' motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).[12]

---

[12] Nieves requests, in her conclusion, that the Court reverse the ALJ's decision and award benefits. Pl. Mem. at 37; Pl. Rep. at 10. Alternatively, she requests remand for a new hearing before a new ALJ. *Id.* Neither request is granted. First, a decision to reverse and remand solely for a calculation of benefits is only appropriate where the Court has "no apparent basis to conclude that a more complete record might support the Commissioner's decision." *Butts v. Barnhart*, 388 F.3d 377, 385–86 (2d Cir. 2004). That is not the case here, and Nieves has not provided any reasoning or arguments to the contrary. Second, cases have been remanded to a different ALJ in limited circumstances, such as when the ALJ was

The Clerk is directed to grant the motion at Docket Number 20, deny the

Commissioner's cross-motion at Docket Number 26, and enter judgment for Nieves.

**SO ORDERED.**

Dated: March 30, 2022
        New York, New York

_____
JAMES L. COTT
United States Magistrate Judge

---

improperly appointed under the Appointments Clause of the United States
Constitution, *see, e.g., Croston v. Saul*, No. 19-CV-6151 (GBD) (JLC), 2020 WL
7756214, at *4 (S.D.N.Y. Dec. 30, 2020) (case remanded to different ALJ when
deciding ALJ had been improperly appointed prior to July 16, 2018), *adopted sub
nom. Croston v. Comm'r of Soc. Sec.,* No. 19-CV-6151 (GBD) (JLC), 2021 WL
1172618 (Mar. 29, 2021), or when the conduct of an ALJ gives rise to serious
concerns about the fairness of the review process, *see, e.g., De Mota v. Berryhill*, No.
15-CV-6855 (PED), 2017 WL 1134771, at *10 (S.D.N.Y. Mar. 24, 2017) (collecting
cases).  Here, Nieves does not challenge the propriety of the ALJ's appointment, nor
has she provided any other basis for why remand to a different ALJ is appropriate
in this case.  Therefore, the Court declines to reverse and remand solely for a
calculation of benefits, and likewise declines to remand to another ALJ.